| | |
|---|---|
| Cher L. Vue, | Civ. No. 17-4110 (BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Nancy A. Berryhill,
Acting Commissioner of
Social Security, | |
| Defendant. | |

Thomas A. Krause, Esq., Schott, Mauss & Associates, PLLC, counsel for Plaintiff.

Elvi Jenkins, Esq., Special Assistant U.S. Attorney, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Cher Lor Vue seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. This matter is before the Court on the parties' cross–motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 15, 18.) For the reasons stated below, the Court concludes that the Administrative Law Judge's ("ALJ") decision is supported by substantial evidence in the record. Therefore, Plaintiff's motion is denied and Defendant's motion is granted.

# BACKGROUND

## I.     Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on July 15, 2014, alleging a disability onset date of October 1, 2013. (Tr. 11, 58.)[1] The Social Security Administration ("SSA") denied her claim initially on November 3, 2014, and on reconsideration on April 2, 2015. (Tr. 84–87, 118–21.) A hearing was then held by an ALJ on July 5, 2015. (Tr. 11, 41–57.) After the hearing, Plaintiff submitted additional medical evidence, which was reviewed and added to the record. (Tr. 11, 324–25.) The ALJ issued a decision denying benefits on August 18, 2016 (Tr. 11–24), and Plaintiff sought review. The SSA Appeals Council denied Plaintiff's request for review on July 6, 2017, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4); 20 C.F.R. § 404.981.

On September 1, 2017, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1, Compl.) The parties then filed cross–motions for summary judgment, pursuant to the Local Rules. (Doc. Nos. 15, 18.) In Plaintiff's motion, she argues that the ALJ did not properly evaluate work-related restrictions suggested by her treating physician, Dr. Daniel Larkin. (Doc. No. 16, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 8–21.) Plaintiff also argues that the ALJ did not account for her required use of a cane. (*Id.* at 22–23.) Finally, Plaintiff argues that the ALJ did not properly evaluate work-related limitations from her treating psychologist, Dr. Nicole

---

[1]     Throughout this Opinion and Order, the abbreviation "Tr." is used to reference the Administrative Record. (Doc. No. 14.)

Ward, and the consultative examiner, Dr. John O'Regan. (*Id.* at 24–30.) Defendant argues that the ALJ properly weighed the opinions of Drs. Larkin, Ward, and O'Regan, and Plaintiff's need to use an assistive walking device. (Doc. No. 19, Def.'s Mem. Supp. Mot. Summ. J ("Def.'s Mem.") 5–21.)

## II.    Factual Background

Plaintiff was born in Laos on January 19, 1969. (Tr. 214, 942.) She emigrated to the United States in 1989 and is a United States citizen. (Tr. 214.) Plaintiff is the mother of six children, and she lives in St. Paul with her husband and four of her adult children. (Tr. 44, 939–43.)

Plaintiff's primary language is Hmong, and she cannot read or understand English. (Tr. 249, 290.) Plaintiff required an interpreter at her disability hearing, and she is often accompanied by an interpreter to her doctor's appointments. (Tr. 41–57, 288, 335, 943.) Plaintiff has no formal schooling or specialized job training. (Tr. 251.) She completed only the third grade in Laos. (Tr. 942.) Plaintiff worked as a Personal Care Aid ("PCA") for her elderly mother for about ten years until she passed away in 2013. (Tr. 46, 236.) Plaintiff also did some clerical work and assembly work through a temporary employment agency. (Tr. 52, 251.) Plaintiff has not worked since losing her PCA job in 2013. (Tr. 46.)

At her hearing, Plaintiff testified that she herself requires PCA assistance for four hours a day because she is unable to perform certain aspects of daily living, such as bathing, grooming, cooking, cleaning, and the laundry. (Tr. 53.) According to Plaintiff, she has difficulty standing-up and walking because of pain in her knee, and she has a

hard time using her hand due to pain shooting down from her shoulder. (Tr. 54.) Plaintiff has a driver's license, but she testified that when she started driving she would get lost and confused, so her children have advised her not to drive on her own. (Tr. 54–55.)

Plaintiff has had multiple surgeries, including right knee surgery, gastric bypass surgery, and gallbladder removal surgery. (Tr. 245–46, 903, 923.) Following her knee surgery, Plaintiff was prescribed a four-point cane to help her walk. (Tr. 384.) Plaintiff also reported having a "significant history of depressive symptoms" and a "low self concept," partly due to her morbid obesity. (Tr. 940.) In November 2014, Plaintiff, who is five feet three inches tall, weighed 243 pounds, with a Body Mass Index ("BMI") of 43. (Tr. 61.) By September 2015, two months after her gastric bypass surgery, Plaintiff had lost thirty-two pounds, and by the following February, she had lost sixty-two pounds. (Tr. 681, 687.) On March 17, 2016, she weighed 185 pounds, which was down from 250 pounds in 2014. (Tr. 696.)

## III.   The ALJ's Findings and Decision

In his decision dated August 18, 2016, the ALJ denied Plaintiff's application for DIB, finding that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 24.) The ALJ proceeded through the five–step evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4). These steps are as follows: (1) whether the claimant is presently engaged in "substantial gainful activity"; (2) whether the claimant is severely impaired; (3) whether the impairment meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can

4

perform other jobs available in sufficient numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2013, the alleged onset date. (Tr. 13.)

At step two, the ALJ found that Plaintiff's severe impairments were depression with anxiety symptoms, obesity status post gastric bypass, lumbar degenerative disc disease, right knee meniscal tear with surgical repair, and arthritis with pain. (Tr. 13.) The ALJ noted several non-severe impairments, including abdominal pain, a fatty liver, cervical degenerative changes, diabetes, and hyperthyroidism. (Tr. 14.) These impairments, according to "evidence and testimony," resulted in "at most mild work-related limitations." (*Id.*)

Since the ALJ determined that Plaintiff had severe impairments, he continued to step three of the analysis, where a claimant must show that her impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(iii). In examining Plaintiff's impairments, the ALJ reviewed the Listing of Impairments, specifically Sections 1.04 (disorders of the spine), 1.02 (major dysfunction of a joint), and 12.04 (depressive disorders). (Tr. 14–16.) The ALJ found that Plaintiff's impairments did not meet the criteria for any of these listings. (*Id.*) The ALJ also considered Plaintiff's obesity in relation to the listings, but concluded that "the record does not reflect manifestations at the level to medically equal any listed impairment." (Tr. 15.)

Before considering step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work subject to the following limitations:

> [O]ccasional climbing of ramps and stairs, never climbing ladders, ropes and scaffolds, occasional balance, stoop, kneel crouch and crawl, avoid hazardous machinery and heights, routine repetitive instructions, no detailed, complex or technical, routine, repetitive work setting.

(Tr. 16.) In determining Plaintiff's RFC, the ALJ analyzed Plaintiff's symptoms using the two–step process: (1) whether Plaintiff's medical impairment could reasonably be expected to produce her symptoms, and (2) the extent to which the symptoms limit the claimant's functioning. (Tr. 16–17.) The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22.)

The ALJ first addressed Plaintiff's mental impairments. (Tr. 17–18.) The ALJ explained that while Plaintiff received treatment for psychological impairments, the treatment, which involved medication, psychotherapy, and group therapy, was essentially routine or conservative in nature, and was generally successful in controlling her symptoms. (Tr. 18.) In December 2013, Plaintiff reported during a diagnostic assessment that she was very depressed as her mother-in-law and husband were making her depressed. (Tr. 17.) At that time, Plaintiff was on various medications, including Prozac, and she was diagnosed with a depressive disorder and a Global Assessment of

Functioning ("GAF") score of 41 to 50.[2] (*Id.*) The ALJ gave this score "no weight"

because it was "the only one in this range" and "[v]ery quickly, in fact the next month, it

moved up in to the 51–60 range and remained at that range or even higher." (*Id.*)[3]

Plaintiff then continued to attend individual and group counseling sessions. (*Id.*) The ALJ

also noted that in December 2014, Plaintiff reported that her mood was better, and a

provider observed that her affect was generally euthymic. (*Id.*) In February 2015,

---

[2]    The Global Assessment of Functioning (GAF) Scale is used to report "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000). GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34. GAF scores of 51–60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* GAF scores of 61–70 indicate "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

[3]    The ALJ later explained that he gave "little weight" to any of Plaintiff's GAF scores. (Tr. 18.)

> While the claimant received some [GAF] scores throughout the record, which would normally indicate just mild to moderate mental health symptoms or impairments per the DSM-IV 4th ed., a GAF is just one tool used by clinicians to develop the clinical picture. It represents a snapshot in time and cannot be used in isolation from the rest of the evidence to make a disability decision. A GAF further includes factors that are outside of the Social Security Administration's disability considerations. It is noted that the GAF as a measure of functioning is highly subjective and less clinically helpful than the mental status examinations, which in this case, have been given significant abnormalities.

(*Id.*)

Plaintiff reported improved mood with her medication. (*Id.*) And in April 2016, Plaintiff's psychomotor activity was within normal limits, she spoke at a normal rate and volume, her mood was fairly stable, and her memory was intact. (*Id.*) Thus, the ALJ found the evidence did not "support the mental limitations alleged, but supports the residual functional capacity assessed." (*Id.*)

The ALJ recounted that in June 2014, Plaintiff participated in a psychological examination as a precursor to bariatric surgery. (Tr. 18.) The examiner, Dr. Paul S. Bagdade, PhD LP, determined that Plaintiff was not a viable candidate for bariatric surgery from a psychosocial perspective. (*Id.*) Dr. Bagdade made several recommendations, however, and Plaintiff returned to see him in January 2015. (*Id.*) At that time, Plaintiff had made significant changes in her eating and lifestyle. (*Id.*) She was able to decrease the frequency of seeing her individual psychotherapist because of the level of mood stability. (*Id.*) Plaintiff also had a good understanding of the risks and benefits of the surgery, and her therapist was supportive of Plaintiff proceeding with the surgery. (*Id.*) Thus, in January 2015, Dr. Bagdade opined that there were "no longer contraindications for bariatric surgery from a psychosocial perspective," and Plaintiff proceeded to have the surgery. (Tr. 18, 937.)

Turning to Plaintiff's physical impairments, Plaintiff pursued chiropractic care for her back pain, and she also had right knee pain and was seen post-surgery in September 2013 for a torn meniscus. (Tr. 18.) Plaintiff's treating physician, Dr. Larkin, prescribed a four-point cane in November 2013. (Tr. 19.) A year later in November 2014, Dr. Larkin supported Plaintiff's claim for disability, but the ALJ wrote that "this is not

consistent with his examination of the claimant." (*Id.*) The ALJ noted that in November 2014, Plaintiff was in no distress, she walked with an antalgic gait, and there was no edema in her lower extremities. (*Id.*) In June 2015, there was no knee effusion, and she was not in any distress. (*Id.*) At that time, she was given small amounts of Tylenol 3 for her back and knee pain, and Dr. Larkin wanted her to discontinue the Tylenol when seen in February 2016. (*Id.*) The ALJ also noted that Plaintiff denied back pain when seen in May 2015. (*Id.*) Thus, the ALJ reasoned that the "objective medical evidence and course of medical treatment is consistent with the above residual functional capacity and inconsistent with the degree of limitation alleged by the claimant." (*Id.*)

The ALJ did take note of Plaintiff's gastric bypass surgery, which suggests that the related symptoms were "genuine." (Tr. 20.) He stated that "[w]hile that fact would normally weigh in claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." (*Id.*) Plaintiff also declined Dr. Larkin's recommendation for a corticosteroid injection for her knee pain in December 2013, suggesting to the ALJ that "the symptoms may not have been as serious as has been alleged in connection with this application and appeal." (*Id.*) The ALJ further reasoned that the treatment for her back pain had been conservative in nature, and no surgical intervention was required. (*Id.*) And her daily activities, including taking care of her husband, cleaning, using a checkbook/money orders, shopping for groceries, and visiting with her family, are fully consistent with the residual functional capacity, according to the ALJ. (*Id.*)

The ALJ took Plaintiff's work history into consideration, which was consistent with competitive full-time employment. (Tr. 20.) He stated that this was "to her credit," but it did not support "a finding of disability absent objective evidence of disabling symptoms and limitations." (*Id.*)

The ALJ continued by discussing the available opinion evidence. (Tr. 20–22.) The ALJ gave "great weight" to the opinion of state agency physician Dr. Gregory Salmi, who stated that Plaintiff was capable of light work with certain limitations. (Tr. 20.) The ALJ reasoned that the opinion was supported by objective evidence, including imaging studies, observations by providers, and her ability to perform daily activities. (*Id.*) The ALJ explained that he "fully accommodated" for her cane use by restricting her RFC from balancing, climbing of ladders, ropes or scaffolds or other hazards. (*Id.*) The ALJ also gave great weight to the opinion of state agency psychologist Dr. Jeffrey Boyd, who stated that Plaintiff was capable of routine, repetitive instructions. (Tr. 21.) Both state agency opinions were affirmed on reconsideration. (Tr. 20–21.)

The ALJ gave "very little weight" to Dr. Larkin's opinion that Plaintiff could not perform low stress jobs. (Tr. 21.) The ALJ reasoned that while Plaintiff reported back pain dating back for twenty years, it did not prevent the performance of full time work. (*Id.*) The ALJ also stated that Plaintiff had not fully availed herself of treatment; in particular, Plaintiff declined a knee injection, and other than medication following the surgery, Plaintiff did not pursue treatment for her knee. (*Id.*) Finally, the ALJ pointed out that Dr. Larkin's observations during his examinations did not support the limitations. (*Id.*)

Regarding Plaintiff's mental limitations, the ALJ gave "very little weight" to the June 2016 opinion of her treating psychologist, Dr. Ward, that Plaintiff would be absent from work for more than four days per month and had moderate to marked limits in many areas of functioning. (*Id.*) The ALJ gave "no weight" to a similar opinion from consulting psychologist Dr. O'Regan. (Tr. 22.) This was due to "suboptimal effort noted by the doctor in his examination and testing," and that other evidence in the record fails to support it. (*Id.*)

After consideration of Plaintiff's RFC, at step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (*Id.*) But at step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform given her age, education, work experience, and RFC. (Tr. 23.) The ALJ relied on the vocational expert's testimony that, given these factors, a person would be able to perform the requirements of occupations such as bench assembler, electronic worker, and hand packager. (*Id.*) Accordingly, the ALJ found that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national and state economies, and concluded that Plaintiff was not disabled from her alleged onset date through the date of the decision. (Tr. 23–24.)

## DISCUSSION

## I.      Standard of Review

Congress has established the standards by which social security disability insurance benefits may be awarded. The SSA must find a claimant disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that he is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that he cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d at 536 (citations omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to

grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994). The Court thus considers both evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner*, 607 F.3d at 536.

If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Goff v. Barnhart* 421 F.3d 785, 789 (8th Cir. 2005). The whole record is considered, including "evidence that supports as well as detracts from the Commissioner's decision," and the Court will not reverse simply because some evidence may support the opposite conclusion. *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). If it is "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings," the Commissioner's decision must be affirmed. *Pearsall v. Massanarri*, 274 F.3d 1211, 1217 (8th Cir. 2001).

## II.     Analysis of the ALJ's Decision

### A.     The ALJ did not err in giving very little weight to Dr. Larkin's opinion.

Plaintiff's treating physician, Dr. Larkin, generally opined that Plaintiff was unable to perform "low-stress jobs." (Tr. 21, 445.) According to Dr. Larkin, Plaintiff's depression contributed to the severity of her symptoms and limitations, her pain and other symptoms constantly interfered with her attention and concentration, and she could not walk one block without severe pain. (Tr. 445–46.) Dr. Larkin opined that Plaintiff needed

to sit for at least six hours in an eight-hour work day, change sitting positions at will and take unscheduled breaks, and use a cane for walking. (Tr. 445–46.) Dr. Larkin also indicated that Plaintiff could rarely lift twenty pounds, occasionally lift less than ten pounds, and occasionally look down, turn her head, look up, or hold her head in a static position. (Tr. 446.) Plaintiff argues that Dr. Larkin's opinions are entitled to controlling weight because they are well-supported by the medical evidence, and they are not inconsistent with other substantial evidence. (Pl.'s Mem. 12–20.) Even if not entitled to controlling weight, Plaintiff argues that Dr. Larkin's opinions should be given great weight. (*Id.* at 20–22.)

Treating physician opinions are generally entitled to controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.[4] *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017); *Kelly v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). When an ALJ gives less than controlling weight to a treating physician's opinion, the ALJ must give good reasons for the weight assigned to that opinion. *Chesser*, 858 F.3d at 1164. Good reasons for assigning lesser weight to a treating source opinion include when "the treating physician's opinions are themselves inconsistent,"

---

[4]     The requirement to give controlling weight to the opinion of a treating physician or medical professional unless it is contradicted by substantial evidence is referred to as the Treating Physician Rule. On March 27, 2017, the Social Security Administration rescinded the Treating Physician Rule with respect to social security disability claims filed after March 27, 2017. *See* 82 Fed. Reg. 15263 (March 27, 2017). Since Plaintiff filed for disability well before that date, the Treating Physician Rule still applies to her case.

*Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996), or where "other medical assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). If the ALJ determines that the treating physician's opinion is not controlling, he must evaluate the following factors to determine the weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) consistency of the opinion with the record as a whole; (5) whether the doctor is a specialist; and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(2)–(6).

The ALJ gave "very little weight" to Dr. Larkin's opinion for three reasons. (Tr. 21.) First, the ALJ stated that while Plaintiff reported back pain dating back for twenty years, it did not prevent the performance of full time work as a PCA. (*Id.*) Second, the ALJ explained that Plaintiff had not fully availed herself of treatment; in particular, Plaintiff declined a knee injection, and other than medication following her knee surgery, Plaintiff did not pursue treatment for her knee. (*Id.*) Third, the ALJ pointed out that physical examination observations did not support the limitations. (*Id.*) On one occasion, for example, Dr. Larkin observed that Plaintiff was in no distress. (Tr. 21, 381.) And in a visit the month after her knee surgery in October 2013, another provider noted that imaging on her knee showed minimal changes. (Tr. 21, 331.)

These observations are supported by substantial evidence in the record. For example, Plaintiff had an x-ray on her right knee in August 2013, which showed no evidence of fracture, dislocation, or joint effusion. (Tr. 19, 361.) An MRI showed a tear

of the medial meniscus, but there was only mild degenerative chrondomalacia in the medial and patellofemoral compartments. (Tr. 19, 362.) Plaintiff then underwent arthroscopic surgery on her knee in September 2013. (Tr. 334.) During an orthopedic follow-up in October 2013, an examination of both knees revealed minimal degenerative changes and a small tear of the lateral meniscus, with no signs of swelling, tenderness, bruising, or discoloration. (Tr. 19, 331.) Plaintiff had a normal gait and full range of motion bilaterally. (Tr. 331.) Plaintiff was given a cortisone injection in the right knee and advised to return to the clinic in eight weeks. (Tr. 331.)

Later, in June 2014, Plaintiff was in no acute distress and presented no complaints of back or knee pain. (Tr. 637.) In October 2014, a physical examination showed that Plaintiff had full range of motion in her hips, knees, and ankles, with no sign of effusion or tenderness to palpation, and she had 5/5 strength in her lower extremities. (Tr. 711.) An MRI of Plaintiff's lumbar spine showed only mild degenerative spondylosis in the lumber spine, and there was no significant central spinal canal stenosis or neural foraminal narrowing. (Tr. 551.) Then, in November 2014, Dr. Larkin supported Plaintiff's application for disability, but Dr. Larkin's support was inconsistent with his treatment notes, which stated that Plaintiff was in no distress, and there was no edema in her lower extremities. (Tr. 19, 636.) Although Dr. Larkin stated that he thought Plaintiff was unemployable, he did not report any objective findings or assess any work-related limitations that would preclude her from fulltime work activity. (Tr. 636.) In June 2015, there was no knee effusion, and by February 2016, Dr. Larkin wanted to discontinue Plaintiff's use of Tylenol for back and knee pain. (Tr. 19, 661, 688.) It is permissible for

an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009).

Finally, the Court notes that in June 2014, Plaintiff participated in a psychological examination as a precursor to bariatric surgery. (Tr. 939–43.) The examiner, Dr. Bagdade, determined that Plaintiff was not a viable candidate for bariatric surgery from a psychosocial perspective. (*Id.*) Dr. Bagdade made several recommendations, however, and Plaintiff returned to see him in January 2015. After this visit, Dr. Bagdade changed his assessment, and Plaintiff proceeded to have the surgery on July 12, 2015. (Tr. 18, 737.) Dr. Bagdade explained:

> Since starting the health and behavior assessment, this patient has made significant changes in her eating and lifestyle. She has been able to decrease the frequency of seeing her individual psychotherapist because of the level of mood stability. She appears to be much more mindful about her eating. She has a good understanding of the risks and benefits of the surgery. She has realistic expectations about the surgery. Her therapist is also supportive of her proceeding with the surgery. Thus, at this point, there are no longer contraindications to bariatric surgery from a psychosocial perspective.

(Tr. 937.)[5] Thus, Plaintiff showed significant improvements in her mental health before having bariatric surgery. In turn, the results of the bariatric surgery

---

[5]     At the hearing, the ALJ explained as follows:

> The bariatric surgery was paid for, obviously, by medical assistance, Ramsey County. It's required, under their program, that they do this big study, checking out her psychological functioning, her physical functioning, her need for the surgery. There's this whole thing that they go through, to approve this. And if it's not done, they won't approve it. So what I need to get is that assessment. . . . Once I get that, I'll be able to pick

(Footnote Continued on Next Page)

17

improved Plaintiff's mental health, alleviated her stress, and improved her overall physical condition due to the loss of weight. (*See, e.g.*, Tr. 834 (note from before bariatric surgery that Plaintiff "would be more comfortable with who she is if she didn't weigh so much"); Tr. 696 (note from after surgery: "weight 185, which is down from 250 pounds"); Tr. 808 (Plaintiff "reported feeling she has more energy since the surgery," and "seems to have brighter affect").)

For the foregoing reasons, substantial evidence supports the ALJ's finding that Dr. Larkin's opinion was entitled to little weight, and the ALJ gave good reasons for discounting that opinion.[6]

### B.  The ALJ properly considered Plaintiff's use of an assistive walking device.

Plaintiff had knee surgery on September 25, 2013, and on November 19, 2013, Dr. Larkin prescribed a cane for Plaintiff to help her walk following the surgery. (Tr. 334, 384.) Plaintiff asserts that the ALJ erred by not specifically including her need to use a cane in his RFC. (Pl.'s Mem. 22.) The ALJ did, however, account for Plaintiff's walking

---

(Footnote Continued From Previous Page)

the file up, see what that doctor says. [Because] that's really a very complete psychological and physical assessment of the functionality of the proposed patient, so—and they're very good about that. And it's pretty neutral, and usually, pretty reliable. So I'm kind of going to wait and see what that says.

(Tr. 50–51.)

[6]  Plaintiff does not argue that she is entitled to a closed period of disability prior to her bariatric surgery. Instead, Plaintiff argues that substantial evidence does not support the ALJ's decision that Plaintiff is not disabled "from October 1, 2013, through the date of this decision." (Tr. 11.) Plaintiff failed to make that showing in this appeal.

difficulties in the RFC: limitations in balancing, climbing ladders, ropes, scaffolds, and workplace hazards. (Tr. 16.) This aspect of the RFC is supported by state agency medical consultant Dr. Salmi, who opined that Plaintiff could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds, and she could only occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 20, Tr. 78.) Dr. Salmi explained that the postural limitations were included "[d]ue to knee pain and radial meniscus tear with added hip pain limit ladders and stairs. Also kneeling and work on knees is limited." (Tr. 79.) Dr. Salmi's opinion was affirmed on reconsideration by state agency consultant Ann Fingar, M.D., on April 2, 2015. (Tr. 20, 96–98.) Dr. Fingar noted that "[i]mprovement would be expected with bariatric surgery and subsequent weight loss." (Tr. 98.) Plaintiff had bariatric surgery in July 2015 and proceeded to lose a significant amount of weight. (Tr. 666, 681, 687, 690.) By March 2016, Plaintiff weighed 185 pounds, down from 250. (Tr. 696.) Thus, even though the ALJ did not specifically reference Plaintiff's use of a cane, the ALJ properly incorporated Plaintiff's walking limitations into the RFC, and the RFC is supported by substantial evidence in the record.

### C. The ALJ did not err in weighing the opinions of Dr. Ward and Dr. O'Regan.

Plaintiff argues that the ALJ erred by not adopting the work-related limitations provided by her treating psychologist, Dr. Ward, limitations that are consistent with the opinions of consultative psychologist Dr. O'Regan. (Pl.'s Mem. 24.) Dr. Ward opined

that Plaintiff had moderate to marked limits in many areas of functioning,[7] and that she would be absent from work more than four days per month. (Tr. 889–90.) Dr. O'Regan similarly opined that Plaintiff would not be able to carry out work-like tasks with reasonable persistence or pace, would have difficulty responding appropriately to brief and superficial contacts with coworkers, supervisors, and the public, and would not be able to tolerate the stress and pressure typically found in an entry level workplace. (Tr. 441.) The ALJ gave Dr. Ward's opinion "little weight," and afforded "no weight" to the opinion of Dr. O'Regan. (Tr. 21, 22.)

The ALJ found that Dr. Ward's opinion was inconsistent with other treatment notes in the record. (Tr. 21, 449–75.) Specifically, in September 2014, Plaintiff was seen for medication management and reported that she was generally feeling better with less depression. (Tr. 450.) Plaintiff's mood and ability to function were improved, and she had "less depressed mood, less worry, and is sleeping better." (*Id.*) Her memory was intact and speech was normal. (*Id.*) Then, in January 2015, Plaintiff rated her depression as a four out of ten, indicating it was more manageable, and she was engaging, motivated, and was able to respond appropriately to questions. (Tr. 453, 455.) The ALJ also cited

---

[7]      Dr. Ward opined that Plaintiff had marked limitations in the ability to sustain ordinary routine without special supervision; respond appropriately to changes in a routine work setting; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress, and complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 889–90.) Dr. Ward also opined Plaintiff had moderate difficulties in all other areas of mental functioning. (*Id.*) Regarding functional limitations, Dr. Ward opined that Plaintiff had marked restrictions in activities of daily living, marked difficulties in maintaining concentration, persistence, or pace, and moderate difficulties in concentration. (Tr. 890.)

these treatment notes as justification for rejecting Dr. O'Regan's opinion. (Tr. 22.) Moreover, the ALJ also observed that during testing with Dr. O'Regan, Plaintiff "gave up easily on memory tasks, but with encouragement, she frequently came up with the right answers." (Tr. 22 (citing Tr. 439.)) Thus, the ALJ gave Dr. O'Regan's opinion "no weight due to the suboptimal effort noted by the doctor in his examination and testing." (Tr. 22); *see Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) ("The ALJ was entitled to draw conclusions about [the claimant's] credibility based on [testing] analyses indicating that [claimant] was exaggerating symptoms and giving less than his full effort."). Thus, the ALJ's rejection of these opinions is supported by substantial evidence in the record. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").

## ORDER

Based on the foregoing, and all the files, records, and submissions herein,

**IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 15) is **DENIED**; and

2. Defendant's Motion for Summary Judgment (Doc. No. 18) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: August 24, 2018.                    *s/ Becky R. Thorson*_____
                                          BECKY R. THORSON
                                          United States Magistrate Judge